IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| C-E Minerals, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION FILE |
| | ) | |
| CARBO Ceramics, Inc., | ) | NO.:  1-11-CV-2574-JOF |
| | ) | |
| Defendant. | ) | |

---

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND SUPPORTING BRIEF**

---

Frank M. Lowrey IV
Georgia Bar No. 410310
*lowrey@bmelaw.com*
Mary Webb Pyrdum
Georgia Bar No. 940420
*pyrdum@bmelaw.com*

BONDURANT, MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia  30309-3417
Tel: (404) 881-4100
Fax: (404) 881-4111

*Counsel for Plaintiff,*
*C-E Minerals, Inc.*

911013.1

## INTRODUCTION

Plaintiff C-E Minerals, Inc. seeks a preliminary injunction preventing defendant CARBO Ceramics, Inc. from enforcing or attempting to enforce a non-competition provision contained in a supply agreement between the parties.  Under that agreement, C-E sold CARBO raw clay.  CARBO used that clay in the manufacture of ceramic proppants – small ceramic spheres used in the extraction of oil and natural gas.  Paragraph 5 of the parties' supply agreement provided – without qualification or exception – that C-E "will not enter into competition with CARBO in the manufacture or sale of ceramic proppants" and that CARBO will not enter into "direct competition" with C-E in the sale of certain clays.  Although the supply agreement expired at the end of 2010, this non-competition provision endures by its terms until December 31, 2013.

Over five years ago, C-E informed CARBO in writing that it regarded Paragraph 5 as a nullity that imposed no valid constraints on either party.  Now, C-E is prepared to compete with CARBO in the manufacture of ceramic proppants, bringing some relief to a badly under-supplied market.  It has brought this lawsuit to ensure that CARBO does not interfere with its market entry by attempting or threatening to enforce Paragraph 5, which is *per se* invalid and unenforceable under federal antitrust law and the applicable state law.  This Court should enjoin

911013.1

CARBO from enforcing that provision, just as courts in this Circuit have done before when presented with improper contractual restraints on competition.

## STATEMENT OF FACTS

C-E's principal office is in Roswell, Georgia, and it owns a facility in Andersonville, Georgia for the mining, processing and sale of clay.  CARBO has a registered office in Atlanta, and it owns a facility in Eufaula, Alabama where it manufactures lightweight ceramic proppants using clay.  Fortier Decl. ¶ 2. CARBO "is the world's largest manufacturer of ceramic proppant." http://www.carboceramics.com (last visited on Sept. 1, 2011); Parias Decl. ¶ 10.

Proppants are used in the extraction of oil and natural gas through a process known as hydraulic fracturing, which consists of pumping fluid down a well at pressures sufficient to fracture the rock formation.  Proppants are transported in the fluid to fill the fractures, "propping" them open after the pumping stops.  The proppant-filled fractures serve as a permeable channel through which oil or natural gas flows more freely, thereby increasing production.  *Id*. ¶ 4.

In June 2003, C-E and CARBO entered into a Raw Material Requirements Agreement (the "Agreement"), under which C-E would sell CARBO a certain percentage of CARBO's raw clay requirements, up to a maximum quantity.  *See* Fortier Decl. ¶¶ 3-4 & Ex. A; Answer ¶ 6.  Most of that clay came from C-E's

Alabama reserves, although some came from Georgia.  Fortier Decl. ¶ 4.  The term

of the Agreement was seven years, starting January 1, 2004.

> Paragraph 5 of the Agreement, entitled "Non-Compete," provides:
>
> Without intending to limit the legal rights of either party, CARBO and C-E agree as follows:  that CARBO will not enter into direct competition with C-E in the manufacture of calcined clay for general sale to refractory or other related industry, and that C-E will not enter into competition with CARBO in the manufacture or sale of ceramic proppants.  This agreement will endure for 3 years after the expiration of this contract.

*Id*. Ex. A.  The Agreement expired on December 31, 2010.  So, by its terms, the

non-competition provision will endure until December 31, 2013.

In mid-2006, C-E wrote CARBO, stating its view that this non-competition

provision was not valid or binding on either party.  *Id*. ¶ 12 & Ex. C.  CARBO

disagreed.  *Id.* Ex. D.  The final communication in the exchange was C-E's August

7, 2006 letter informing CARBO that "Paragraph 5 is unenforceable, has not been

in force as a practical matter since the inception of the agreement, and as such we

do not intend to abide by the covenant contained in this particular paragraph."  *Id.*

Ex. E.  C-E assured CARBO that it would "continue to comply with all of the

remaining provisions of the current agreement," and it did so.  *Id.*

For years, C-E has possessed several advantages that would facilitate its

entry into the business of manufacturing ceramic proppants.  In addition to selling

911013.1

3

raw materials, C-E has long produced a range of products from clay for use in industrial applications involving high heat and pressure.  It has a sizeable manufacturing and processing facility, equipped with large kilns, located in Andersonville near substantial reserves of clay that could be used to make proppants or other "refractory" products (*i.e.*, products that maintain their strength and structural integrity under high temperatures).  *Id*. ¶¶ 7-9; Parias Decl. ¶¶ 5-7. In addition, C-E has access to the expertise and resources of the Imerys family of companies, which are world leaders in transforming mined resources into specialty products for industrial applications.  *Id.*  Given these resources and its proven processing capacity, C-E has for years had the potential to enter the market as a viable manufacturer of ceramic proppants.  *Id.*  That was true in 2003, when CARBO and C-E entered the Agreement.  *Id.*

By 2008, it was apparent that the supply of lightweight ceramic proppants available for purchase by U.S. customers was well below demand.  Parias Decl. ¶ 8.  Leveraging its resources and expertise, C-E constructed a proppants line at its Andersonville facility.  C-E is prepared to compete immediately with CARBO in the manufacture of lightweight ceramic proppants.  *Id.*; Fortier Decl. ¶ 10.  A sister company of C-E has entered several advance supply agreements with customers for the sale of proppants to be manufactured by C-E.  Parias Decl. ¶ 13.

911013.1

4

Recent shortages in the supply of lightweight ceramic proppants have resulted in multiple market price increases. *Id*. ¶ 11. Despite significant price increases, CARBO has sold out its inventories. *Id.*; Answer ¶ 13 (admitting sell-out). Some oil and gas service companies have not been able to purchase enough proppants to compete for jobs requiring that product. Parias Decl. ¶ 12. Even large purchasers have very few choices of supply. *Id.* By entering the market, C-E will bring supply closer to demand, something that CARBO – the self-described largest manufacturer of ceramic proppants in the world – would like to avoid for as long as possible.

## ARGUMENT AND CITATION OF AUTHORITY

C-E seeks preliminary injunctive relief to preclude CARBO from enforcing or threatening to enforce the non-competition provision of the parties' supply agreement to hinder C-E's entry into the proppants market. "A party seeking a preliminary injunction must demonstrate that: (1) [it] has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered absent an injunction; (3) the injury to the movant outweighs the injury the proposed injunction would cause to the opposing party; and (4) the proposed injunction would serve the public interest." *Johnston v. Tampa Sports Auth.*, 530 F.3d 1320, 1325 (11th Cir. 2008). C-E easily meets these standards.

I.   **C-E Has a Substantial Likelihood of Demonstrating that the Non-Competition Provision Is Unenforceable Under Federal Antitrust Law.**

As potential competitors in the manufacture and sale of ceramic proppants, CARBO and C-E could not lawfully agree to refrain from competing by allocating the proppants market to CARBO and the clay market to C-E.  Such an agreement is *per se* invalid under Sherman Act Section 1 and is conclusively presumed to unreasonably restrain trade.  As a result, it is unenforceable as a matter of law.

   A.   **Agreements by Actual or Potential Competitors to Refrain from Competition by Allocating Markets are Unlawful *Per Se*.**

Section 1 of the Sherman Act prohibits actual or potential competitors from allocating markets and agreeing to refrain from competition.  *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46 (1990).  "[S]uch agreements are anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other."  *Id*. at 46.

In *Palmer*, one offeror of bar review courses (HBJ) entered a licensing agreement authorizing another bar review company (BRG) to use its copyrighted course materials in Georgia.  In the license, they agreed that HBJ would not compete with BRG in Georgia and that BRG would not complete with HBJ outside of Georgia.  *Id.* at 47.  The district and circuit courts upheld this non-competition provision because the parties did not divide a market in which both had previously

911013.1

6

competed.  *Id.* at 48.  The Supreme Court reversed, confirming that an agreement by competitors to allocate markets is unlawful, regardless of whether they had previously competed in the allocated markets or were instead merely potential competitors.  *Id.* at 49-50 (citing *U.S. v. Topco Assocs., Inc.*, 405 U.S. 596 (1972) and *Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332, 344 n.15 (1982)).[1]

"[C]ertain kinds of agreements will so often prove so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstances. An agreement of such a kind is unlawful *per se*."  *NYNEX Corp. v. Discon, Inc.*,

---

[1] *See also In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp. 2d 1279, 1315 (S.D. Fla. 2005) ("There is no question here that this case presents a "horizontal" [market allocation] agreement.  For purposes of this analysis, no distinction is made between actual competitors (*i.e.,* those currently competing in the same market) and potential competitors.")); *Fricke-Parks Press, Inc. v. Fang*, 149 F. Supp. 2d 1175, 1180 (N.D. Cal. 2001) ("Section 1 condemns market allocations of territories.  No less so, section 1 makes allocations of product markets illegal, even when such allocations are unaccompanied by price fixing or other restraints.  The proscription against market allocations or divisions extends to potential as well as actual competitors.") (citations to Supreme Court authority omitted); *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 235-36, 239 (E.D.N.Y. 2003) ("For more than a century, agreements between actual or potential competitors to allocate territories or customers have been considered *per se* violations of Section 1 of the Sherman Act. …. The Supreme Court has held that parties can be horizontal competitors regardless of whether they are actual competitors (*i.e.*, currently competing in the same market) or potential competitors.") (collecting authorities); *In re Cardizem CD Antitrust Litig.*, 105 F. Supp. 2d 618, 677 (E.D. Mich. 2000) (prohibition on market allocation applies to potential as well as actual competitors, citing *Palmer*).

525 U.S. 128, 133 (1998) (citations omitted).  *Per se* violations are *conclusively* presumed to be unreasonable and unlawful.  *Maricopa County*, 457 U.S. at 344; *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 (11th Cir. 1991). "The only inquiry in such cases [of a *per se* violation] is whether there was an agreement … because the unreasonableness of the restraint is presumed."  *Levine v. Central Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1545-46 (11th Cir. 1996).

In applying this *per se* rule, the Supreme Court has distinguished "vertical" and "horizontal" restraints.  "Vertical restraints occur between entities at different levels of distribution in order to control the price or path of a product after the product leaves the manufacturer, while restraints between competitors at the same level of distribution are characterized as horizontal."  *DeLong Equip. Co. v. Washington Mills Abrasive Co.*, 887 F.2d 1499, 1505 (11th Cir. 1989).  Vertical restraints are often lawful; "horizontal" restraints are usually not.  *Id.*  But a restraint on horizontal competition does not avoid the *per se* rule because it is included in an otherwise vertical arrangement.  In *Palmer*, for example, HBJ and BRG occupied a vertical relationship as licensor and licensee of course materials. But the market allocation provision of the license was *per se* unlawful because it restrained their conduct as horizontal competitors, *i.e.*, as suppliers of the same product (bar review courses).  498 U.S. at 48-50.

As confirmed by *Palmer*, a horizontal market allocation agreement between actual or potential suppliers of competing products is a *per se* violation of the Sherman Act.[2] The Supreme Court has firmly adhered to this rule, even as it has reconsidered *per se* treatment for other conduct, such as "vertical" resale price-fixing agreements between manufacturers and distributors. *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 904 (2007). "The same legal standard (*per se* unlawfulness) applies to horizontal market division and horizontal price fixing because both have similar economic effect." *Id.*

**B.    The Non-Competition Provision in the Parties' Supply Agreement Is a *Per Se* Unlawful Market Allocation.**

It is easy to apply the antitrust laws to the provision before the Court. While C-E and CARBO may occupy something like a vertical relationship as seller and buyer of clay, Paragraph 5 restricts their horizontal competition as manufacturers of proppants and suppliers of clay to the same pool of buyers. It purports to prevent C-E from competing horizontally with CARBO in the manufacture or sale of proppants, anywhere and in any way. And it prevents CARBO from "direct competition with C-E" in the production and sale of certain clays to certain industries. Fortier Decl. Ex. A ¶ 5. This provision, particularly the restraint on

---

[2] *See also Gainesville Utils. Dep't. v. Florida Power & Light Co.*, 573 F.2d 292, 299 (5th Cir. 1978) ("A horizontal market division in most industries is clearly a *per se* violation of the Sherman Act.").

proppant manufacturing by C-E, has nothing to do with "control[ling] the price or path of a product after the product leaves the manufacturer," which is the hallmark of a vertical restraint. *DeLong*, 887 F.2d at 1505. Instead, it prohibits C-E from making proppants using its own resources and selling them to third parties.

The fact that C-E sold clay to CARBO does not somehow permit them to refrain from horizontal competition as suppliers of proppants or clay, any more than the course materials license in *Palmer* allowed the parties to agree to refrain from horizontal competition nationwide. And the fact that C-E was initially a potential competitor of CARBO, rather than an actual competitor as now, matters no more here than it did in *Palmer*. "'[T]he law does not condone the purchase of protection from uncertain competition any more than it condones the elimination of actual competition.'" *Arkansas Carpenters Health & Welfare Fund v. Bayer AG*, 604 F.3d 98, 104 (2d Cir. 2010) (quoting 12 Herbert Hovenkamp, *Antitrust Law* ¶ 2030b, at 213 (2d ed. 2005)); *see also supra* at 7 & n.1.

Because Paragraph 5 is a horizontal agreement to allocate markets and refrain from competition, it falls within the *per se* rule and is conclusively presumed to be unreasonable. C-E has no doubt that competition would suffer substantially from the enforcement of a provision that would foreclose its entry into a market, like this one, where demand chronically exceeds supply. But the

911013.1

terms of Paragraph 5 are fatal in themselves without conducting any such inquiry.

This is not the rare exception where restraints on horizontal competition escape the *per se* rule.  This was not some joint venture to create a new product where "restraints on competition are essential if the product is to be available at all."  *American Needle, Inc. v. NFL*, 130 S.Ct. 2201, 2216-17 (2010); *see also Broadcast Music, Inc. v. CBS,* 441 U.S. 1, 23 (1979) ("Joint ventures and other cooperative arrangements are also not usually unlawful ... where the agreement ... is *necessary* to market the product at all") (emphasis added).  This was simply a raw materials supply contract, like countless other contracts where one party buys an input for its manufacturing from another.  Paragraph 5 does not increase net output or lower price or serve any purpose other than suppressing competition.[3]

CARBO's apparent defenses of Paragraph 5 do not diminish C-E's chances of success.  CARBO alleges that this provision "is an ancillary restraint designed to foster procompetitive activity" because, if C-E had refused to agree to it, "CARBO would have located another source of [clay], resulting in, among other

---

[3] *See, e.g., In re Terazosin*, 352 F. Supp. 2d at 1318 ("Defendants neither integrated their production or distribution, nor did they create a new product, market or other joint venture for which horizontal restraints were essential. Instead, the … Agreement clearly denied to consumers the opportunity to choose among alternative … products without offering the possibility of any joint, efficiency-producing activities.  The Agreement, therefore, contains a naked, not an ancillary, restraint of trade that is properly condemned under *per se* analysis.").

911013.1

things, higher prices for proppant customers and the loss of C-E jobs in both

Alabama and Georgia."  Answer at 11-12 (Defense 4).   By this reasoning, any

restriction on competition becomes procompetitive so long as one party insists

upon it as a condition of entering an otherwise productive agreement.

That is not the law, and for good reason.  Parties could avoid *per se* rules

against price-fixing or market allocation simply because one side refused to

contract without such a provision.  That is not what the Supreme Court meant by a

restraint that is "essential if the product is to be available at all."  *American*

*Needle*, 130 S.Ct. at 2216-17.  This is not professional sports, where there can be

no league at all without considerable agreement on how teams will and will not

compete.  *Id.*; *see also NCAA v. Bd. of Regents,* 468 U.S. 85, 109-10 (1984).   Nor

is this case like *Broadcast Music,* where it would have been impossible to create a

blanket broadcast license for purchase by radio stations unless all copyright holders

jointly agreed to market their music that way.  441 U.S. at 23.  This was simply a

raw materials supply contract.  CARBO's refusal to enter such an agreement

without protection against post-termination horizontal competition does not change

that.  Even if CARBO would have gone elsewhere for clay absent a market

allocation agreement, the antitrust laws demand that it do so, preferring to trust free

market competition, rather than collusion, to reduce prices and generate jobs.

Nor is it viable for CARBO to defend Paragraph 5 as a confidentiality provision, as suggested in its Counterclaim, ¶¶ 12-13.  First, the idea that Paragraph 5 is somehow a surrogate confidentiality provision is implausible.  The Agreement says not one word about confidentiality or nondisclosure, as it surely would if CARBO was really going to share valuable confidential or proprietary information with C-E.  Sophisticated parties genuinely concerned about the use or disclosure of their confidential information include non-use and non-disclosure provisions in their contracts.  As it is, C-E was free to publish anything it supposedly learned from CARBO in the newspaper or sell it to anyone who wanted to manufacture proppants.  The truth is that CARBO never even purported to be sharing proprietary information with C-E, which explains why there was no confidentiality provision.  *See* Hall Decl. ¶¶ 5-6; Fortier Decl. ¶¶ 5-6.

In addition to debunking CARBO's factual explanation for Paragraph 5, CARBO's conspicuous failure to protect its supposedly proprietary information waived any interest in confidentiality it might otherwise have possessed.  Applying Georgia and Alabama law, the courts of this circuit have rejected secrecy claims as a matter of law where allegedly proprietary information was protected better than it

was here.[4]  CARBO cannot rely on a waived interest in confidentiality as a pro-competitive excuse for Paragraph 5 or a countervailing interest to resist injunction.

Importantly, the question is not whether the parties thought of Paragraph 5 as a confidentiality provision (although clearly they did not).  Legality under Sherman Act Section 1 does not depend on the parties' subjective belief, but rather the *objective* intent and effect of their agreement.  In other words, an otherwise *per se* unlawful market allocation does not become enforceable because the parties believed, even sincerely, they were serving some legitimate purpose.  *See* 11 Areeda & Hovenkamp, Antitrust Law ¶ 1907a at 271 (3d ed. 2011).  "A pure heart does not justify a naked restraint."  *Id.*

---

[4] *See, e.g., Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1334-35 (N.D. Ga. 2007) (summary judgment where company took inadequate measures to restrict its own employee's access to or otherwise protect a parts and raw materials list); *Servicetrends, Inc. v. Siemens Medical Sys., Inc.*, 870 F. Supp. 1042, 1074 (N.D. Ga. 1994) (summary judgment where manufacturer shared allegedly confidential technical data with customers with no protection beyond "proprietary data" and "confidential" designations); *In re Dippin' Dots Patent Litig.*, 249 F. Supp. 2d 1346, 1375-76 (N.D. Ga. 2003), aff'd, 369 F.3d 1197 (11th Cir. 2004) (summary judgment where alleged secrets disclosed with no confidentiality agreement); *Allied Supply Co., Inc. v. Brown*, 585 So.2d 33, 36 (Ala. 1991) (affirming summary judgment where alleged secret was not protected from disclosure or even marked confidential); *J.H. Wright & Assocs., Inc. v. Engerson*, 2000 WL 1848135, at *8 (S.D. Ala. Dec. 1, 2000) (denying injunction to protect allegedly confidential product drawings not designated confidential or protected by a confidentiality agreement); *Alagold Corp. v. Freeman*, 20 F. Supp. 2d 1305, 1315-16 (M.D. Ala. 1998), aff'd, 237 F.3d 637 (11th Cir. 2000) (granting summary judgment under similar facts).

Finally, even if Paragraph 5 was genuinely meant to protect confidentiality, competitors simply cannot protect proprietary information by allocating markets. Competitors will not be heard to argue that "market division is necessary to prevent firms from violating one another's intellectual property rights." 11 Areeda & Hovenkamp, ¶ 1907b at 274. Notably, Paragraph 5 does not say that C-E cannot use any information it obtains from CARBO. It says that C-E cannot compete in the manufacture or sale of ceramic proppants – period – no matter their specifications or how they are manufactured. It would apply even if C-E purchased ceramic proppants from an independent manufacturer for resale.

Whatever legitimate interest CARBO could have in any information it supposedly divulged to C-E, it does not extend to the right to prevent C-E from manufacturing ceramic proppants at all. Potential competitors may not agree to restraints on competition beyond their legally protected intellectual property rights. *Palmer*, for example, involved a license to use copyrighted course materials, but that did not allow the parties to divide the market between them. And in *Fashion Originators Guild of America v. FTC*, 312 U.S. 457, 461-68 (1941), competing garment manufacturers could not agree to boycott retailers who purchased knock-offs of dresses copied from their original designs, even though their purpose was to protect their proprietary designs, rather than raise prices. "[E]ven if copying [dress

designs] were an acknowledged tort under the law of every state, that situation would not justify petitioners in combining together to regulate and restrain interstate commerce in violation of federal law." *Id.* at 468.

To take another example, potential competitors cannot protect patent rights by agreeing to competitive restraints in excess of the exclusive rights conveyed by the patent. *See U. S. v. Line Material Co.*, 333 U.S. 287, 308 (1948). *Compton v. Metal Prods., Inc.*, 453 F.2d 38 (4th Cir. 1971) is a good example:

> Here, the agreement that Compton was not to compete with respect to the type of equipment licensed meant that Compton also agreed not to compete with regard to equipment which may not have embodied any of his patents. In addition, by agreeing not to compete so long as royalties were due, Compton, in fact, agreed not to compete with regard to equipment embodying expired patents.

*Id.* at 44.[5]  Surely the antitrust laws do not afford greater leeway to "protect" supposedly confidential information (shared without the slightest protection against disclosure) than to protect statutory patent rights.  In sum, CARBO's post hoc attempt to revision Paragraph 5 as a confidentiality provision does not diminish C-E's substantial likelihood of success.

---

[5] *See, e.g.*, *In re Terazosin*, 352 F. Supp. 2d at 1313-14 (holding patent settlement to be *per se* illegal market allocation because restraints exceeded patent rights); *In re Cardizem*, 105 F. Supp. 2d at 685 (same); *Arkansas Carpenters*, 604 F.3d at 104 ("Patent settlements, like all private contracts, are subject to antitrust scrutiny. ...  Thus, like ordinary contracts, patent settlements cannot take the form of "market-sharing agreements.") (citing *Palmer*, 498 U.S. at 49, *United States v. Sealy, Inc.,* 388 U.S. 350, 357-58 (1967) and other authorities.)

**C.**   **Contract Provisions that Violate the Antitrust Laws Are Unenforceable as a Matter of Law.**

A contract provision that violates federal antitrust law is unenforceable. *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77-78 (1982).  As the Supreme Court confirmed in *Kaiser*, "our cases leave no doubt that illegal promises will not be enforced in cases controlled by the federal law."  *Id.* at 77.  Among other decisions, it cited *Continental Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227 (1909), which "refused to enforce a buyer's promise to pay for purchased goods on the ground that the promise to pay was itself part of a bargain that was illegal under the antitrust laws."  455 U.S. at 77.  "In such cases the aid of the court [in enforcing the contract] is denied, not for the benefit of the defendant, but because public policy demands that it should be denied without regard to the interests of individual parties.'"  *Id.* at 77-78 (quoting *Continental*, 212 U.S. at 262).

The Court distinguished promises that are not themselves violations of the antitrust laws, which *sometimes* may be separated and enforced even if another promise in the same contract is unlawful.  *Id.* at 79-81 (distinguishing *Kelly v. Kosuga*, 358 U.S. 516 (1959)).  But it made clear that no promise that violates the antitrust law is enforceable.  *Id.*  On that point, *Kaiser Steel* "does not admit of exceptions."  *Bassidji v. Goe*, 413 F.3d 928, 936-37 (9th Cir. 2005).  Thus, federal courts "have an absolute 'duty to determine whether a contract violates federal law

911013.1

17

before enforcing it.'" *Teamsters Local Union 682 v. KCI Constr. Co.*, 384 F.3d

532, 537 (8th Cir. 2004) (quoting *Kaiser Steel*).  Here, the Court's duty is to refuse

enforcement of the market allocation provision of the parties' supply contract.

**II.    C-E Also Has a Substantial Likelihood of Demonstrating that the Non-Competition Provision Is Unenforceable Under Georgia Law.**

Georgia courts apply Georgia law and public policy to determine the

enforceability of non-competition agreements, regardless of the law selected by the

parties.  *See, e.g., Boone v. Corestaff Support Servs., Inc.*, 2011 WL 3418382, at

*3-4 (N.D. Ga. Aug. 3, 2011) and cases cited therein.  Federal courts sitting in

Georgia must do the same.  *Id.*; *Manuel v. Convergys Corp.*, 430 F.3d 1132,

1139 (11th Cir. 2005).  Moreover, applying Georgia law is particularly appropriate

where – as here – the competition purportedly forbidden by the contract would

occur in and from Georgia, where C-E will manufacture proppants.

"In Georgia, contracts that generally restrain trade are void against public

policy."  *Atlanta Bread Co. Int'l, Inc. v. Lupton-Smith*, 285 Ga. 587, 588 (2009).

And, under Georgia law, an agreement – like this one – that would preclude the

parties from competing in the production or sale of a specified product anywhere in

the world is unenforceable as "a contract in *general* restraint of trade."  *PCS Joint

Venture, Ltd. v. Davis*, 465 S.E.2d 713, 714 (Ga. App. 1995) (emphasis added).

The non-competition provision in the parties' supply agreement does not fit

911013.1

any category of covenants even potentially enforceable as partial restraints of trade. *See generally Jenkins v. Jenkins Irrigation, Inc.*, 259 S.E.2d 47, 49-50 (Ga. 1979) (classifying types of agreements in partial restraint of trade). This was not an employment relationship or the sale of an ongoing business or a partnership or joint venture. Nor was it a distributorship agreement, since neither party contractually agreed to resell some product to be supplied by the other.

We have found no Georgia case recognizing that parties in a supplier-purchaser relationship may agree even to a partial restraint on post-termination competition. However, this supply agreement would not be enforceable even if treated as a distributorship agreement, which is perhaps the closest fit under Georgia law. A non-competition provision in a distribution agreement is unenforceable without a territorial limitation.[6] There is no such limitation in Paragraph 5. Moreover, the scope of the prohibited activity must be reasonable in light of the legitimate interests of the protected party. *See Jenkins*, 259 S.E.2d at

---

[6] *See, e.g.*, *Atlanta Bread*, 285 Ga. at 589-91 (both in-term and post-term restraints held unenforceable for lack of territorial limitation); *Owens v. RMA Sales, Inc.*, 358 S.E.2d 897, 899 (Ga. App. 1987) (restriction on marketing similar product was "clearly not limited in territorial effect, and thereby renders the entire contract illegal"); *Jenkins*, 259 S.E.2d at 49-50. The provision here would not be valid even if implicitly limited to territories in which CARBO sold during the term of the agreement. *See, e.g.*, *Taylor Freezer Sales Co. v. Sweden Freezer Eastern Corp.*, 160 S.E.2d 356, 359 (Ga. 1968); *Gandolfo's Deli Boys, LLC v. Holman*, 490 F. Supp. 2d 1353, 1358-59 (N.D. Ga. 2007) (citing Georgia authorities).

911013.1

19

49-50.  Yet Paragraph 5 prohibits any and all competition in the manufacture or sale of ceramic proppants, no matter how they are designed or produced.  Even if CARBO had some legitimate interest – other than the desire to avoid competition – this provision would be far broader than necessary to protect it.

This same line of cases disposes of CARBO's attempt to defend Paragraph 5 as a back-door confidentiality agreement.  Georgia courts have held that non-competition agreements with no territorial limitations are unenforceable in manufacturing and supply relationships where – unlike here – there actually was an exchange of proprietary information.  For example, in *Amstell, Inc. v. Bunge Corp.*, 443 S.E.2d 706 (Ga. App. 1994), Amstell had developed a special concentrate used in the production of fiber-fortified milk.  It contracted to have its concentrate manufactured and distributed by Bunge Corporation (successor to the original manufacturer-distributor).  Bunge executed both a manufacturing *and a nondisclosure contract*, agreeing in both contracts that, during the agreement and for three years thereafter, it would not produce fiber-fortified milk concentrates for its own account or others.  *Id.* at 706-07.  The Court applied Georgia law, notwithstanding the choice of different law in the contract.  *Id.*  And under Georgia law, the non-competition provisions were unenforceable because they contained "absolutely no territorial limits."  *Id.*

Like the covenants in *Amstell*, the non-competition provision in the parties' supply agreement contains absolutely no territorial limitation.  If that was fatal in *Amstell*, which involved a far more collaborative venture and a recognized transfer of confidential information, it is surely fatal in the arm's length supply contract here.  Nor is Paragraph 5 reasonably limited to what would be needed to protect the only even potentially legitimate interest suggested by CARBO – its allegedly confidential information.  Thus, Paragraph 5 is unenforceable under Georgia law.

## III.   C-E Also Has a Substantial Likelihood of Demonstrating that the Non-Competition Provision Is Unenforceable Under Alabama Law.

Finally, Paragraph 5 is unenforceable under Alabama law, which was designated to govern the contract.  Agreements that violate the federal antitrust laws also violate Alabama Code § 8-10-3.  *See, e.g., Ex parte Rice*, 67 So. 2d 825, 829 (Ala. 1953) ("The federal statutes, Sherman and Clayton, prescribe the terms of unlawful monopolies and restraints of trade as they should also be administered in Alabama.").  And when considering a claim under the Alabama antitrust law, courts should look to federal case law as well.  *See, e.g., McCluney v. Zap Prof'l Photography, Inc.*, 663 So. 2d 922, 926 (Ala. 1995).  On top of that, Alabama's antitrust statutes specifically prohibit any arrangement "to fix or limit the quantity of any article or commodity to be produced, manufactured, mined or sold" in the state.  Ala. Code § 8-10-1.   Paragraph 5 violates this code section because it

911013.1

purports to prohibit CARBO from producing, mining or selling clay in Alabama and to prohibit C-E from making or selling proppants there (by constructing a proppants line near its Alabama clay reserves, for example).

Under Alabama law, contracts that violate *either* federal or state antitrust laws have long been unenforceable. *Georgia Fruit Exch. v. Turnipseed*, 62 So. 542, 546 (Ala. Ct. App. 1913) ("[I]f the contract is in violation of either [federal or state antitrust] law it is void as contravening a positive statute; and, even if it does not go to the extent of being in actual violation of either statute, yet if it tends to create a monopoly by unreasonably restraining trade, it is still void under our law, as at common law, as being against public policy."); *Flowers & Peagler v. W.T. Smith Lumber Co.*, 47 So. 1022, 1023 (Ala. 1908) (contract in restraint of trade held unenforceable. Thus, under federal, Georgia and Alabama law, Paragraph 5 is unenforceable, just as C-E informed CARBO years ago.

## IV.   C-E Is Entitled to a Preliminary Injunction Restraining CARBO From Enforcing or Attempting to Enforce the Non-Competition Provision.

As shown above, C-E has a substantial likelihood of demonstrating that Paragraph 5 is unenforceable under federal, Georgia and Alabama law (and it need prevail under only one of these bodies of law to obtain the relief it seeks). The other requirements for injunctive relief are satisfied as well. As circuit precedent shows, being restrained from competition by an unlawful agreement is an

911013.1

22

irreparable injury that warrants injunctive relief.  *See, e.g.*, *MacGinnitie v. Hobbs Group, LLC*, 420 F.3d 1234, 1241-43 (11th Cir. 2005) (*reversing* denial of injunction as an abuse of discretion where non-competition clause was invalid); *Bryan v. Hall Chem. Co.*, 993 F.2d 831, 835-36 (11th Cir. 1993) (affirming preliminary injunction prohibiting enforcement of non-competition provision).

 C-E is ready to enter the market now.  It would suffer irreparable injury if it were prohibited from doing so until January 2014.  All the revenues it would have generated and all of the customer relationships, credibility, goodwill and market presence that C-E and its sister companies would have accumulated during those intervening years would be forever lost.  *See, e.g.*, *MacGinnitie*, 420 F.3d at 1241-43 (treating "lost opportunities" to compete as an irreparable harm, reversing denial of injunction); Parias Decl. ¶¶ 14-15.  Moreover, absent relief, CARBO could use Paragraph 5 to discourage customers from contracting to purchase proppants manufactured by C-E by suggesting that C-E cannot lawfully honor its supply commitments, just as CARBO has alleged in its Counterclaim, ¶ 30.  Any after-the-fact damages that C-E could prove for this anticompetitive conduct would be no substitute for being able to compete freely for customers in the first place.

 These threatened injuries to C-E and competition outweigh any possible harm to CARBO.  The only "harm" that CARBO could suffer would be free

competition.  But, as the Eleventh Circuit observed, "[l]oss of business due to free and fair competition is not a harm; violation of legal rules designed to promote such competition is a harm."  *MacGinnitie*, 420 F.3d at 1243.  Whatever entitlement CARBO might otherwise have to the enforcement of its private contracts cannot override the laws protecting competition.  "[I]t is clear that the policies expressed in the federal antitrust laws will override any agreement in contravention of those policies, regardless of the agreement's legality under private contract law."  *CVD, Inc. v. Raytheon Co.*, 769 F.2d 842, 855 (1st Cir. 1985).

Finally, "the proposed injunction would serve the public interest," *Johnston*, 530 F.3d at 1325, including the interest of proppants customers (and the public generally) in free price and supply competition for those goods.  Courts refuse to enforce contracts that violate the antitrust laws "'because public policy demands that … without regard to the interests of individual parties.'"  *Kaiser*, 455 U.S. at 77-78 (quoting *Continental*, 212 U.S. at 262).

CARBO apparently contends that C-E cannot challenge the prospective enforceability of Paragraph 5 because it agreed to the provision in the first place. *See* Answer at 11 (asserting "unclean hands").  But that does not bar prospective injunctive relief here, any more than it did in any of the numerous cases brought by one contracting party to enjoin enforcement of a non-competition provision.

911013.1

24

"[B]ecause the Supreme Court has rejected the application of the doctrine of *in pari delicto* in antitrust actions, an agreement may be challenged even by one of the parties who has acquiesced in the unlawful agreement." *Tidmore Oil Co. v. BP Oil Co./Gulf Prods. Div.*, 932 F.2d 1384, 1388 (11th Cir. 1991).[7]

In sum, a contract provision that violates federal and state laws protecting competition does not become prospectively enforceable because both parties agreed to the contract. Instead, this Court should enjoin the enforcement of the non-competition provision of the parties' supply agreement, in keeping with Circuit precedent.

Respectfully submitted, this 14th day of September, 2011.

/s/ Frank M. Lowrey IV
Frank M. Lowrey IV
Georgia Bar No. 410310
Mary Webb Pyrdum
Georgia Bar No. 940420

---

[7] *See, e.g., Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 715 (11th Cir. 1984) (franchisees could challenge exclusive territorial allocation despite agreeing to it by contract and previously seeking to invoke it); *Wegmann v. London*, 648 F.2d 1072, 1072-75 (5th Cir. June 26, 1981) (partner could seek declaration and injunction against provisions of partnership agreement that violated Sherman Act); *Simpson v. Union Oil Co.*, 377 U.S. 13, 15-16 (194) (contracting party could challenge a then-*per se* unlawful resale price-fixing provision).

911013.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, a true and correct copy of the foregoing

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND**

**SUPPORTING BRIEF** was electronically filed with the Clerk of Court using the

Court's electronic filing system which will automatically send e-mail notification

of such filing to the following attorney of record:

Samuel S. Woodhouse, swoodhouse@woodhouselawfirm.com

and a copy by United States First Class Mail to the following Non-CM/ECF
Participant:

James R. Eiszner
Shook Hardy & Bacon L.L.P.
2555 Grand Boulevard
Kansas City, MO 64108-2613
James R. Eiszner, jeiszner@shb.com

This 14th day of September, 2011.

*/s/ Frank M. Lowrey IV*
Frank M. Lowrey IV
Georgia Bar No. 410310

911013.1

26