**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

C-E Minerals, Inc**.**,                              :
                                                    :
        Plaintiff,                                  :
                                                    :
        v.                                          :        CIVIL ACTION NO.
                                                    :        1:11-cv-02574-JOF
CARBO Ceramics, Inc**.**, et al.,                   :
                                                    :
        Defendants.                                 :

## ORDER

This matter is before the court on Plaintiff's motion for preliminary injunction [10].

**I.      Background**

        **A.      Procedural History and Facts**

        Plaintiff, C-E Minerals, Inc. filed the instant declaratory judgment action against

Defendant, CARBO Ceramics, Inc., on August 4, 2011.  Plaintiff asks the court to declare

a particular provision in the parties' requirements supply contract to be a *per se* violation of

Section 1 of the Sherman Act, 15 U.S.C. § 1.  Plaintiff also asks the court to find this

provision is an illegal, unreasonable, and unenforceable restraint of trade under Georgia and

Alabama state law.  C-E asks the court to grant preliminary injunctive relief enjoining

CARBO from enforcing or threatening to enforce the provision of the contract.  The court

heard argument on Plaintiff's motion for preliminary injunction on February 15, 2012.

The facts in this case are undisputed. C-E owns and operates a facility for the mining, processing, and sale of kaolin clay in Andersonville, Georgia. CARBO owns and operates a manufacturing facility in Eufaula, Alabama, for the manufacture and sale of ceramic proppants which are used in the extraction of oil and natural gas. C-E supplies to CARBO clay that is used in the manufacture of the proppants.

In 1995, the parties signed a clay Supply Agreement which lasted for a term of eight years until December 31, 2003. The parties then signed a second Raw Material Requirements Agreement ("the Supply Agreement") which is at issue in this litigation. The term of the second Supply Agreement ran from January 1, 2004 through December 31, 2010. Unlike the first agreement, this Supply Agreement contained a non-compete clause which reads:

> Without intending to limit the legal rights of either party, CARBO and C-E agree as follows: that CARBO will not enter into direct competition with C-E in the manufacture of calcined clay for general sale to refractory or other related industry, and that C-E will not enter into competition with CARBO in the manufacture or sale of ceramic proppants. This agreement will endure for 3 years after the expiration of this contract.

*See* Supply Agreement, ¶ 5.[1] The Supply Agreement expired on December 31, 2010, and Paragraph 5's non-compete clause is set to expire on December 31, 2013. Despite the

---

[1]The 1995 Agreement contained a clause which permitted C-E to terminate the Agreement if CARBO entered the calcined clay market.

existence of this clause, counsel for C-E admitted at oral argument that C-E is currently manufacturing and selling ceramic proppants.

In 2006, C-E corresponded with CARBO and stated C-E's position that Paragraph 5 was invalid and unenforceable. C-E stated that it did not intend to follow Paragraph 5, but that it would abide by the other provisions in the Agreement. CARBO responded that it believed Paragraph 5 to be enforceable and reserved its right to seek to enforce that portion of the Supply Agreement. The parties continued under the terms of the Supply Agreement despite their differing views on the enforceability of Paragraph 5.

There are shortages of supply in the lightweight ceramic proppant market. Despite the fact that CARBO has increased its prices, it routinely sells out its inventory for ceramic proppants.

## B. Contentions

Plaintiff argues that Paragraph 5 is a *per se* violation of Section 1 of the Sherman Act because it is a horizontal market allocation where actual or potential customers have agreed to refrain from competing in a particular market. Because Paragraph 5 violates antitrust law, Plaintiff contends, it cannot be enforced. Plaintiff also avers that Paragraph 5 violates Georgia law governing non-compete agreements because it contains no geographical restriction and violates Alabama state law because it limits the quantity of a commodity to be mined in Alabama, as well as violating federal antitrust law.

3

Defendant first argues that Plaintiff cannot seek equitable relief from the court because it comes with "unclean hands" by delaying taking any action with respect to Paragraph 5 despite the fact that it believed it was unenforceable in 2006. Defendant further responds that Paragraph 5 is not a horizontal market allocation agreement, rather Paragraph 5 is an ancillary confidentiality provision which the parties negotiated because Defendant agreed to accept clay from deposits in Georgia instead of Alabama and certain confidential information would need to be exchanged in order to determine whether the composition of the Georgia clay would work in Defendant's manufacturing process. Because Paragraph 5 is an ancillary agreement and not a naked restraint of trade, Defendant avers, the court must consider it under the Rule of Reason and Plaintiff has not – and cannot – make an argument that Paragraph 5 violates the Rule of Reason. Defendant avers that Paragraph 5 does not violate Georgia state law as it currently stands because Georgia's legislature has made the policy decision to more broadly accept non-compete agreements.

## II.    Discussion

A party seeking a preliminary injunction must show "(1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction issued,

4

and (4) an injunction would not disserve the public interest." *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1217 (11th Cir. 2008) (internal quotation marks omitted).

### A.    Federal Antitrust

It is axiomatic that Section 1 prohibits only those agreements which unreasonably restrain competition. *See Standard Oil Co. v. United States*, 221 U.S. 1, 58-64 (1911). There are a variety of agreements which can unreasonably restrain competition. "A restraint may be adjudged unreasonable either because it fits within a class of restraints that has been held to be 'per se' unreasonable, or because it violates what has come to be known as the 'Rule of Reason.'" *F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 457-58 (1986). The Supreme Court established the *per se* rule in *Northern Pacific Ry. Co. v. United States*, 356 U.S. 1 (1958) when it stated: "there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Id.* at 5. *See also Broadcast Music, Inc. v. Columbia Broadcasting Co.*, 441 U.S. 1, 8 (1979).

Once an agreement is determined to be a *per se* violation, the unreasonableness of the restraint is presumed. *See*, *e.g.*, *Levine v. Central Florida Medical Affiliates, Inc.*, 72 F.3d 1538, 1546 (11th Cir. 1996) (citing *Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332, 344-45 (1982) and *United States v. Trenton Potteries Co.*, 273 U.S. 392, 397-98

AO 72A
(Rev.8/82)

(1927)).  The *per se* rule is the "trump card" of antitrust law.  "When an antitrust plaintiff successfully plays it, he need only tally his score."  *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1362-63 (5th Cir. 1980).  Rule of Reason cases, on the other hand, require the court to "engage in a comprehensive analysis of the agreement's purpose and effect to determine whether it unreasonably restrains competition."  *See Levine*, 72 F.3d at 1546 (citing *Broadcast Music*, 441 U.S. at 24-25).

There is no "bright line" rule as to what separates a *per se* case from a Rule of Reason case.  *See*, *e.g.*, *National Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 779 F.2d 592, 598 (11th Cir. 1987) (quotation and citation omitted).  The "presumption" is that the rule-of-reason standard apples to section 1 cases.  *See*, *e.g. Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 (11th Cir. 1991).  The *per se* rule is applied "only when history and analysis have shown that in sufficiently similar circumstances the rule of reason unequivocally results in a finding of liability."  *Levine*, 72 F.3d at 1546 (citing *Consultants & Designers, Inc. v. Butler Serv. Group, Inc.*, 720 F.2d 1553, 1562 (11th Cir. 1983)).

"Certain types of practices, however, have emerged as traditionally per se violations."  *NaBanco*, 779 F.2d at 598 (citing *United States v. Parke, Davis & Co.*, 362 U.S. 29, (1960) (vertical price fixing agreements); *Timken Roller Bearing Co. v. United States*, 341 U.S. 593 (1951) (horizontal market divisions); *International Salt Co. v. United States*, 332 U.S. 392

(1947) (tying agreements); *Fashion Originators' Guild v. FTC*, 312 U.S. 457 (1941) (group boycotts)).

Plaintiff contends that Paragraph 5 falls into the *per se* category because it is a horizontal market division. "An agreement between competitors to allocate markets is . . . clearly anticompetitive. Such an agreement has the obvious tendency to diminish output and raise prices." *Valley Drug Co. v. Geneva Pharmaceuticals, Inc.*, 344 F.3d 1294, 1304 (11th Cir. 2003). The Supreme Court has explained that an agreement between competitors to allocate market

> is usually termed a "horizontal" restraint, in contradistinction to combinations of persons at different levels of the market structure, e.g., manufacturers and distributors, which are termed "vertical" restraints. This Court has reiterated time and time again that "horizontal territorial limitations . . . are naked restraints of trade with no purpose except stifling of competition." Such limitations are per se violations of the Sherman Act.

*See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972).

The first step the court must take, obviously, is determining whether Paragraph 5 is a horizontal market allocation. Defendant strongly urges that the requirements Supply Agreement is a vertical agreement and Paragraph 5 is merely ancillary to this vertical agreement because it serves the legitimate business purpose of (1) preventing C-E from competing unfairly using confidential information, (2) fostering loyalty, and (3) preventing abusive tactics from a supplier turned competitor. In other words, Defendant argues that Paragraph 5 is not a "naked" restraint.

7

The court finds that the case of *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46 (1990), is instructive on this point.  There, HBJ began offering a Georgia bar review course on a limited basis in 1976.  HBJ was in direct competition with BRG from 1977 to 1979.  In early 1980, the two companies entered into an agreement that gave BRG an exclusive license to market HBJ's materials in Georgia and to use HBJ's trade name Bar/Bri.  The parties also agreed that HBJ would not complete with BRG in Georgia and that BRG would not compete with HBJ outside of Georgia.  *Id.* at 47.  The Court found this agreement unlawful on its face.  *Id.* at 49.  "Such agreements are anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other."  *Id.* at 49-50.  An important aspect of *Palmer* for this case is the fact that the Supreme Court specifically rejected the argument that a market allocation agreement could not violate antitrust law unless the two entities had previously competed against one another.  *Id.* at 49.

The court agrees with Defendant that the Supply Agreement on its own is a vertical agreement, but that does not end the analysis.  The effect of Paragraph 5 was to delay or prevent C-E from entering the market for ceramic proppants.  Thus, C-E is a "potential" competitor of CARBO in the ceramic proppant market.  (Likewise, the effect of Paragraph 5 was to bar CARBO from entering the market for the supply of clay and thus, CARBO was a potential competitor of C-E in the clay market.)  Paragraph 5, therefore, is a horizontal

8

allocation of at least the proppant market because it bars C-E, a potential competitor, from entering the market. *See*, *e.g.*, *General Leaseways, Inc. v. National Truck Leasing Ass'n*, 744 F.2d 588, 591 (7th Cir. 1984) (Posner, J.) ("when firms in the same line of business agree not to enter each other's territories they violate section 1 of the Sherman Act even if they might be able to show that dividing markets and yielded economic benefits greater than any plausible estimate of the costs in diminished competition; that, in short, horizontal market divisions are illegal per se."). The fact that such a horizontal allocation agreement is contained within a vertical agreement does not save it.

Defendant next contends that even if the court were to find that Paragraph 5 represents some kind of "horizontal" agreement, it is not a *per se* violation because it is not a "naked restraint" of trade, but rather an "ancillary restraint" that results in "efficiency-enhancing integration" among the parties to the agreement. *See NaBanco*, 779 F.2d at 603. That is, Paragraph 5 was "necessary" to the Supply Agreement.[2]  Defendant's primary argument that Paragraph 5 is ancillary is the contention that Paragraph 5 is actually a confidentiality agreement. Defendant argues that with the information C-E could glean about CARBO's manufacturing processes during the testing of the Georgia clay, C-E would

---

[2]Because the court finds Paragraph 5 neither "essential" nor "necessary" to the Supply Agreement, the court need not decide which is the precise formulation of the standard under antitrust law. *Compare American Needle, Inc. v. NFL*, 130 S. Ct. 2201, 2216-17 (2010) (using "essential") *with Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 23 (1979) (using "necessary") and *National Bancard Corp. v. VISA, U.S.A., Inc.*, 779 F.2d 592, 601 (11th Cir. 1986) (same).

be able to shorten its path to market by three years.  Thus, the parties agreed to a three year restriction to protect C-E from "free riding" off of CARBO's know-how.

The main problem with CARBO's argument is that Paragraph 5 looks nothing like a confidentiality agreement.  As an initial matter, it never mentions "confidentiality." Furthermore, nothing in Paragraph 5 or the Supply Agreement prohibits C-E from breaching the alleged confidentiality of any information it gleans from CARBO.  C-E could sell the information to a competitor of CARBO with impunity.  On the other hand, C-E is prevented from selling ceramic proppants even if it purchased the proppants from someone else and did not manufacture the proppants itself through information it may have gleaned during CARBO's testing of the Georgia clay.

Moreover, CARBO did not protect any of its information.  As Plaintiff noted, in patent filings, CARBO has long revealed the composition of clay appropriate for the manufacture of proppants.  Those patent filings included a chemical analysis of clay from Andersonville, Georgia, the same location from which C-E intended to supply CARBO. The only evidence CARBO points to concerning its own efforts to protect confidentiality is a form non-disclosure agreement that any visitor to CARBO's proppant plant must sign, including visitors from C-E.  But this general form does not relate to any of the matters CARBO now argues should have been kept confidential, including clay composition.

10

There are some exceptional circumstances which might move a horizontal agreement out of the *per se* category, such as entities working together to bring a new product to the market – a product that would not reach market unless the entities worked as described in their agreement.  *See*, *e.g.*, *American Needle, Inc. v. National Football League*, 130 S. Ct. 2201, 2216-17 (2010).

The parties' Supply Agreement, however, does not fit this category.  The Supply Agreement is a straightforward raw materials supply agreement.  There is no doubt that in the absence of Paragraph 5, either these parties or other companies would sell kaoline to proppant manufacturers.  That is, the Supply Agreement and Paragraph 5, in particular, are not required to guarantee the existence of ceramic proppants.  The fact that the parties had a previous Supply Agreement that did not contain a Paragraph 5-like mutual allocation is ample evidence for the fact that Paragraph 5 is not ancillary to the Supply Agreement.  There is no hint of partnership or joint venture between CARBO and C-E.  To the contrary, theirs is an arms-length relationship.

Defendant also raises some general defenses to Plaintiff's motion.  Defendant argues that Plaintiff delayed in challenging the validity of Paragraph 5, waiting for the end of the term of Supply Agreement and in the meantime accruing benefits under the Supply Agreement.  Defendant contends that Plaintiff's failure to take action with respect to Paragraph 5 in 2006 prevented CARBO from protecting its legitimate business interest in

11

confidentiality in ways other than the enforcement of Paragraph 5. This laches/*in pari delicto* argument, however does not apply to antitrust actions. *See*, *e.g.*, *Official Committee of Unsecured Creditors of PSA, Inc. v. Edwards*, 437 F.3d 1145, 1153 (11th Cir. 2006) (*in pari delicto* does not apply in enforcement of antitrust laws).

Defendant's unclean hands argument is essentially a reformulation of its laches argument. Furthermore, Defendant's unclean hands argument cuts both ways. Plaintiff clearly repudiated Paragraph 5 of the Supply Agreement in 2006 and Defendant took no steps to mandate its enforcement at that time just as Plaintiff took no steps to bar its enforcement. *Rinks v. Courier Dispatch Group, Inc.*, 2001 WL 34090167 (N.D. Ga. Apr. 11, 2001) (Forrester, J.), cited by Plaintiff, is distinguishable because the court's ruling relied to a great extent on the fact that the plaintiff had just accepted a monetary settlement in exchange for signing an agreement releasing any claims she had against her employer when she turned around and sued her employer. The court's ruling hinged on the release agreement and not the underlying non-compete agreements.

In sum, the court finds Plaintiff has a substantial likelihood of demonstrating that Paragraph 5 is a horizontal market allocation that is a *per se* violation of Section 1 of the Sherman Act. In the alternative, the court also considers whether Paragraph 5 violates state law.

12

**B.      State Law**

Although the Supply Agreement provided that Alabama law would apply, Georgia courts would first consider whether the agreement violated Georgia's public policy. *See*, *e.g.*, *Siech v. Hobbs Group, LLC*, 198 Fed. Appx. 840, 841 n.1 (11th Cir. 2006); *Convergys Corp. v. Keener*, 276 Ga. 808 (2003) (law of jurisdiction chosen by parties governs contractual rights unless application of other jurisdiction's law would violate Georgia public policy). If the agreement would not be enforceable under Georgia law, it is violative of Georgia's public policy. *Id.*

When "determining whether the application of [foreign] law creates a conflict, the Court should apply Georgia's public policy as it existed at the time [the employee] entered into the Non-Compete." *Boone v. Corestaff Support Servs., Inc.*, 805 F. Supp. 2d 1362 (N.D. Ga. 2011) (Story, J.). Due to recent statutory and constitutional amendments, questions have been raised as to what constitutes Georgia law on the subject. *Id.* The Georgia legislature passed a new restrictive covenant law in 2009 which gives more favorable treatment to restrictive covenants than they would have received in the past. *Id.* at 1377. Furthermore, a constitutional amendment adopting that law became effective on January 1, 2011. *Id.*

Several courts have held, however, that the statutory and constitutional amendments do not apply to agreements entered into before the effective date of the legislation. *See*, *e.g.*, *Boone*, 805 F. Supp. 2d at 1369 (discussing 2011 law); *Bunker Hill Intern., Ltd. v.*

13

*Nationsbuilder Ins. Servs., Inc.*, 309 Ga. App. 503, 505 n. 1 (2011) (discussing 2009 law); *Gordon Document Prods., Inc. v. Service Techs., Inc.*, 308 Ga. App. 445, 448 n. 5 (2011) (discussing 2009 law); *Cox v. Altus Healthcare and Hospice, Inc.*, 308 Ga. App. 28, 30 (2011) (discussing 2009 law).

Having determined that the new statutory and constitutional amendments should not be applied retroactively, the court must consider whether Paragraph 5 violates Georgia law as it existed at the time the parties entered into Supply Agreement in 2003.  Under Georgia law, contracts that restrain trade are void against public policy.  *See*, *e.g.*, *W.R. Grace & Co. v. Mouyal*, 262 Ga. 464, 465 (1992).  Courts generally consider duration, territorial coverage, and scope of activity in determining whether a particular restraint is reasonable. *Id.* (citing *Watson v. Waffle House*, 253 Ga. 671, 673 (1985)).  *See also Koger Properties v. Adams-Cates Co.*, 247 Ga. 68 (1981) ("Georgia law prohibits contracts or agreements, tending to defeat or lessen competition or in general restraint of trade.  However, covenants against competition in employment contracts are considered in partial restraint of trade, and they are enforceable if strictly limited in time and territorial effect, and if they are otherwise reasonable considering the business interests of the employer sought to be protected and the effect on the employee.").

Georgia applies different levels of scrutiny to restrictive covenants depending on the context of the business arrangement.  The lowest level of scrutiny is given to agreements

14

signed in connection with the sale of a business; the highest level of scrutiny goes to agreements signed in the employment context.  Defendant also argues that Georgia law requires that the court consider the bargaining capacities of the parties and any independent consideration given for the covenant.  However, the case Defendant cites for this proposition – *Palmer & Cay, Inc. v. Marsh & McLennan Companies, Inc.*, 404 F.3d 1297 (11th Cir. 2005) – does not support it.  *Palmer & Cay* discussed an intermediate level of scrutiny that Georgia applies to professional partnership agreements because the partners have relatively equal bargaining power and share equally in consideration.  *Id.* at 1303 n.12.

Supply agreements, such as the instant agreement, are not considered to be analogous to a contract for the sale of a business.  *See*, *e.g.*, *Amstell, Inc. v. Bunge Corp.*, 213 Ga. App. 115 (1994).  There, Amstell developed a fiber base concentrate to be used in the production of fiber-fortified milk.  It contracted with Carlin Foods Corporation to manufacture and distribute the concentrate.  *Id.* at 115.  Carlin executed a nondisclosure agreement.  *Id.* Bunge Corporation became a party to these agreements after it acquired Carlin Foods.  *Id.* The agreements also contained a non-compete clause which stated that for three years after the term of the agreement, Bunge agreed not to produce, or assist or consult in the production of, any concentrates or finished products which are fiber-fortified milk concentrates.  *Id.* Bunge also agreed not to develop, produce, license or market fiber-based concentrates for the production of fiber-containing milks or dairy base for the production

15

of shakes and ice cream. *Id.* at 115-16. Amstell eventually sued Bunge for breaching the covenants not to compete and Bunge defended by arguing the covenants were not valid.

The court first determined that the non-compete at issue was not analogous to a contract for the sale of a business but rather the non-compete was ancillary to an independent contractor manufacturing and distributorship agreement. As such, it should be treated as an employment rather than a sales contract. *Id.* at 116. "Such a covenant is enforceable only where it is strictly limited in time and territorial effect and is otherwise reasonable considering the business interest of the employer sought to be protected and the effect on the employee." *Id.* (quotation and citation omitted). Because the non-competes in *Amstell* contained "absolutely no territorial limits, they are invalid." *Id.*

The court finds the supplier-manufacturer relationship between Plaintiff and Defendant analogous to the facts of *Amstell*. Defendant argues that *Amstell* does not apply to the instant situation because there, the distributor had less bargaining power and the non-compete was one-sided. These factors, however, were not particularly relevant to the court's analysis. The *Amstell* court, rather, found that the parties' relationship most closely matched an employment relationship and therefore the non-compete agreements had to be given careful scrutiny.

In determining the nature of the parties' relationship here, Georgia law, as reflected by *Amstell*, has already accounted for bargaining power and consideration, and has

determined that it should receive the strict scrutiny associated with employment covenants, and not sale-of-business or partnership covenants.  Furthermore, consideration of the facts in this case show that the Supply Agreement is an arms-length negotiation between two sophisticated business partners.  The fact that both parties had reasons for wanting to structure the deal as they did does not mean that any particular party had excessive bargaining leverage.  The only context in which Georgia courts apply the "much less scrutiny" standard suggested by Defendant is the sale of business, which this clearly is not.

Moreover, setting aside the issue of which level of scrutiny applies, the court has located no Georgia case – and the parties have not identified one – in which the court has approved a worldwide territorial restriction.  CARBO exports proppants to 50 countries and C-E and its affiliated companies obtain kaolin from 18 countries.  This scope of business is not sufficient to support the much broader worldwide territorial restriction contained in Paragraph 5.  Regardless of whether CARBO had a legitimate business interest of protecting confidential information – an allegation the court above found not too convincing – that interest still does not support a worldwide restriction.

For these reasons, the court finds that Plaintiff has a substantial likelihood of demonstrating that Paragraph 5 is also invalid under Georgia restrictive covenant law.

### C.      Remaining Preliminary Injunction Factors[3]

The court must now consider whether Plaintiff will suffer irreparable harm absent an injunction and balance the harms.  *See*, *e.g.*, *MacGinnitie v. Hobbs Group, LLC*, 420 F.3d 1234, 1242-43 (11th Cir. 2005).  As to federal antitrust law, the court's ruling that Paragraph 5 is a *per se* violation essentially ends the inquiry.  Moreover, because the court determined that it is substantially likely that Paragraph 5 violates federal antitrust law, the enforcement of the court's injunction is not limited to Georgia.

With respect to Georgia non-compete law, Defendant argues that the alleged harm Plaintiff suffers can be addressed through monetary remedies.  However, in *MacGinnitie*, where the Eleventh Circuit reviewed a district court order denying a motion for preliminary injunction with respect to a non-compete provision, the Court of Appeals held that the unenforceable restrictions on the plaintiff's access to customers, employees, and information was an "irreparable harm" that could not be "undone through monetary remedies."  *Id.* at 1242.  "These injuries are in the form of lost opportunities, which are difficult, if not impossible, to quantify.  Georgia public policy is clear that restrictive covenants in

---

[3]The court is puzzled by Defendant's argument that Plaintiff's requested injunction would violate Defendant's First Amendment right to petition any court.  Plaintiff filed an action for declaratory judgment and a motion for a preliminary injunction.  Defendant has fully participated in litigating before the court and raised counterclaims of breach of contract, disgorgement, and unjust enrichment.  The fact that the court has determined that Plaintiff has a substantial likelihood of demonstrating that Paragraph 5 is invalid does not mean that Defendant did not have an opportunity to petition the court as to its views of Paragraph 5.

employment contracts are disfavored as potential restraints of trade which tend to lessen competition.  Because of this public policy, the Georgia courts and this court have not hesitated to find irreparable harm in cases involving covenants not to compete."  *Id.* (citations omitted).  Likewise, here, C-E's irreparable harm is not being able to pursue opportunities in the ceramic proppants market.

On balancing of the harms, the *MacGinnitie* court held that Georgia public policy disfavored restrictive covenants because of their "negative effect on competition" and therefore, the harms weighed in favor of striking the covenant.  *Id.* at 1243.  "Loss of business due to free and fair competition is not a harm; violation of legal rules designed to promote such competition is a harm."  *Id.*   As such, the court finds that the remaining three factors to consider in whether to issue a preliminary injunction weigh in Plaintiff's favor.

**D.    Bond**

Defendant requests that if the court grants Plaintiff's motion for preliminary injunction, the court should set an appeal bond at $20-$30 million, a figure that reflects CARBO's estimate of the profits C-E would make in the ceramic proppants markets during the intended three year term of Paragraph 5.  Plaintiff responds that Defendant's cause of action regarding Paragraph 5 would be breach of contract for which the appropriate remedy is CARBO's damages and not C-E's disgorgement of profits.  Plaintiff, therefore, asks the court to require a minimal bond or none at all.

19

Federal Rule of Civil Procedure 65(c) provides "the court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *Id.* The determination of the amount of an injunction bond is within the discretion of the court and the court may decide to require no security at all. *See, e.g.*, *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Services, LLC*, 425 F.3d 964, 970-71 (11th Cir. 2005).

The court agrees that Defendant would not be entitled to disgorgement of C-E's profits as measure of damage for its breach of contract claim. Furthermore, the court finds that Plaintiff has a high probability of succeeding on the merits of its claim. In the absence of any evidence or further suggestion on bond, bond is hereby fixed in the sum of $100,000.

## III.  Conclusion

The court GRANTS Plaintiff's motion for preliminary injunction [10].

Defendant is ENJOINED from seeking to enforce the provisions of Paragraph 5.

**IT IS SO ORDERED** this 13th day of March, 2012.

    S/  J. Owen Forrester
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

20